## Susan Gray and others v. Jacob R. Fox and others.

It is a rule well settled in the English chancery, and adopted by this court, that if trustees loan money without *due security*, they are liable in case of insolvency.

As to what is due security, the principle to be extracted from the English authorities is, that the loaning of trust monies, and especially when infants are concerned, on private or personal security, is not a compliance with the rule that requires due security to be taken, and of course, that such loans are made at the risk of the trustees.

In England, a trustee loaning money must require adequate real security, or resort to the public funds. In this country there are few opportunities for investing in the public stocks; the stock of private companies is not considered safe, and investments in that species of stock would scarcely be encouraged by a court of equity; there is no other but landed security that would come within the rule, and the court would advise it to be taken in all cases where public stock cannot be had.

John Britton and Peter Fox, administrators of Arthur Gray, deceased, upon sale of a farm of their intestate, left one third of the nett proceeds in the hands of Moses Everitt, the purchaser, on his bond, as a fund, the interest whereof was to be paid to the intestate's widow during life, in lieu of dower; and after her death the principal to be divided among her heirs, some of whom were minors. Moses Everitt, the obligor, died, and his administrator was making arrangements to pay off this bond. Jonathan Britton (son of the administrator) applied for a loan of the money, and John Britton, with the knowledge and consent of Peter Fox, his co-administrator, assigned the bond to William Boss, received the money for it, and loaned this money to Jonathan Britton on his bond. Jonathan Britton at that time was in mercantile business, and reputed to be in good credit and able to meet his engagements, but was not a man of substantial property, and failed two years afterwards, and a loss was sustained. The trustees, in taking his personal security and trusting to his credit, acted with a degree of negligence which the court could not overlook, and were held responsible for the loss.

After this loan to Jonathan Britton, and before he failed, the guardian of some of the minor heirs applied to the orphan's court to have the money better

April, 1831.

Gray et al.
v.
Fox et al.

secured, when John Britton, the administrator, offered to the court to give a mortgage on two lots of land, to secure the payment of Jonathan Britton's bond. Whereupon the court, at a subsequent term, made an order approving said security, and ordering "that the said money remain on interest, on the security of the said bond and mortgage, until otherwise disposed of agreeably to the act of the legislature." This order is not in pursuance of the act of 13th June, 1820, (*Rev. L.* 779.) The case is not within the jurisdiction of the court, and the order is no protection to the administrators.

Although a farther security may be offered after the loan is made, and the court may approve that security; that does not alter the principle, or bring the case within the statute.

The proper course to be pursued under the eleventh section of that act, is, to obtain the leave and direction of the court, for the purpose of putting out the money; and not to put out the money first, and obtain a decree of confirmation afterwards.

A decree of the orphan's court on a matter over which it has jurisdiction, if fairly obtained, is not to be questioned; but it is a court of limited powers, and if it transcends its jurisdiction its acts will pass for nothing: and if an order is obtained by fraud or misrepresentation, it may be set aside or considered null.

ARTHUR Gray, late of the county of Hunterdon, died in November, 1812, intestate, leaving real and personal estate, and leaving also a widow and a number of children and grand-children. Administration of the personal estate was committed, in due form of law, to John Britton and Peter Fox, both of whom are now deceased. The amount of the personal estate was small, and it became necessary to sell the real property for the payment of debts. An order for that purpose was accordingly obtained from the orphan's court of the county of Hunterdon; and the sale was made to Moses Everitt, for four thousand three hundred and forty dollars and ten cents. In October, 1814, the administrators made a settlement in the orphan's court, on which settlement it appeared there was a balance in their hands of three thousand eight hundred and forty-seven dollars and ninety-nine cents. Two thirds of this amount was afterwards paid by the administrators to the different persons entitled, and the remaining one third was retained, to pay the interest annually to the widow of the intestate, she having released her dower. The widow being dead, the heirs at law of the intestate come into this court for an account, and to compel payment of the sums due to them respectively. A part of the money, it appears, has been lost, and the personal

representatives of Britton and Fox refuse to make good the deficiency.

The complainants charge that it was agreed between themselves, and the administrators, and Moses Everitt the purchaser, that he the said Moses Everitt should retain this money in his hands, so that the interest might be secured for the benefit of the widow, and after her death the principal be distributed among those entitled ; and that in pursuance of such agreement, Everitt, on the 1st of May, 1814, gave his bond to Britton and Fox for the said sum : that Everitt paid the interest annually up to 1822, at which time Britton and Fox assigned the bond against Everitt to one William Boss, on receiving from him the amount thereof, and loaned the money to Jonathan Britton, the son of one of the administrators, on his simple bond, without security ; and that in December, 1822, John Britton executed a mortgage to Fox, his co-administrator or trustee, conditioned to be void on payment of the said sum by Jonathan Britton : that a considerable part of the money is now lost, and the defendants pretend that they are not liable to make good any deficiency, and that the loan so made to Jonathan Britton was under the sanction of the orphan's court, in conformity with the provisions of the act of assembly. The bill has been taken, pro confesso, as against the representatives of John Britton, who have neither appeared nor answered. An answer was put in by Peter Fox in his life time. He denies expressly the charge that the money was retained in the hands of Everitt under any agreement, such as is mentioned in the bill; and insists that Everitt was at liberty to pay the bond when he might be able, and the administrators were bound to receive the money. He states further, that the money remained in Everitt's hands until his death, which was in 1821 ; that it was understood in 1822 that his administrator intended by a sale of the real estate, to raise money and pay off the debts of Everitt; that having an opportunity to loan the money to Jonathan Britton, they assigned the bond over to William Boss; that his co-administrator, John Britton, loaned the money to Jonathan Britton, and took a bond payable to John Britton and Peter Fox, as administrators of Arthur Gray. He further alleges, that the assignment of the bond of Everitt was made by John Britton, his

co-administrator, without his knowledge or concurrence, and his name was put to it as a matter of form; that at the time the loan was made to Jonathan Britton, he was considered in the neighborhood and believed by the defendant to be a man in good credit; and that he paid two years' interest on the bond. The defendant then sets out a proceeding in the orphan's court. He states that some time after the loan to Britton, and in the lifetime of the widow, some person in behalf of some of the heirs of Arthur Gray, called on John Britton to know the situation of the money, and finding it loaned out on personal security, employed counsel to make application to the orphan's court to have the monies secured by other security; that thereupon John Britton, being called on by the court, offered to give a mortgage to his co-administrator on two certain lots of land in the county of Hunterdon, to secure the payment of the said bond of Jonathan Britton; that the court being satisfied that such mortgage would be an adequate security, approved thereof, and directed the money to be continued out at interest upon the security of the bond of Jonathan Britton and the said mortgage, and caused an entry of said proceedings to be made on the minutes of the court. The defendant admits that Jonathan Britton afterwards proved insolvent, and that the mortgages were an insufficient security; but insists that as the order of the court was in all things complied with, he cannot be held answerable for any breach of trust or neglect of duty, and can only be made answerable for the sum realized from the property mortgaged, (being the security taken,) which he proffers himself willing to account for.

John Britton having died, the cause was revived against his representatives. Witnesses were examined, and the cause came on to be heard upon the bill, the answer of Peter Fox, and the proofs.

*G. D. Wall*, for the complainants.

*N. Saxton*, for the defendants.

Cases referred to by the counsel. 1 *P. Wms.* 81, 83, 141, 241; *Pre. Ch.* 173; *Dick. R.* 329, 356; *Salk.* 318; 2 *Bro.*

*C. C.* 114; 3 *Bro. C. C.* 73, 90, 91, 95; 1 *Scho. and Lef.*
341; 2 *Scho. and Lef.* 242; 4 *Ves. jr.* 596; 7 *Ves.* 186; 11
*Ves.* 252; 16 *Ves.* 479; 5 *John. C. R.* 282; 7 *John. C. R.* 22;
19 *John. R.* 427; *Rev. L.* 779.

April, 1831.

Gray et al.
v.
Fox et al.

THE CHANCELLOR. Very little evidence has been taken on
either side, and some of the material allegations in the bill and
answer are not sustained. There is no proof to support the charge
that the money was by the consent of all parties to remain in the
hands of Everitt until the death of the widow, when the differ-
ent persons interested might claim their shares, and it is express-
ly denied by Fox: on the other hand Fox, the defendant, has
failed to show that the transfer of the bond to Boss was without
his privity or approbation. There is reason to believe that the
Everitt bond was about to be paid off. His administrator had ap-
plied for a sale of his real estate to pay debts, as early as October,
1821, and the order was granted in February, 1822, which was
before the transfer and loan to J. Britton. The sale, it is true,
was not actually made until March, 1823; nor was the money
paid to Boss until 1824. The loan to Jonathan Britton was
with the knowledge and consent of both administrators, and there
is some evidence in relation to the solvency and credit of Jona-
than Britton at the time, which will be adverted to hereafter.

Two questions present themselves :—

1. Was the conduct of these trustees such as ought, on princi-
ples of equity, to subject them to any personal liability, in case
the whole or any part of this fund was lost ? And,

2. If they are affected with such liability, will the proceedings
in the orphan's court relieve them ?

There does not appear to be any foundation for the charge
in the bill, that the security was changed from any sinister or
interested motives on the part of the administrators. I am wil-
ling to believe that they honestly thought it advisable and proper
to assign the bond to Boss and to loan the money to some other
person. If they are liable at all, it is not on the ground of cor-
ruption; it must be on the ground of negligence—that they have
loaned out the money without taking due security, in consequence
of which the greater part of it is lost.

It is a well settled rule in the English chancery, that if trustees loan money without due security, they are liable in case of loss by insolvency. This is a safe rule, and the court has no hesitation in adopting it. The duties of trustees are very important, especially where the rights of infants are concerned, and it will always be the pleasure of the court to protect them, so far as it may be done consistently with safety and sound policy. Safety demands that the conduct of trustees should be watched with scrupulous care. Sound policy requires, that the faithful steward should not be entrapped and ruined with technicalities and forms. The rule above stated, however valuable as a general principle for the government of the court, is not sufficiently definite to be of much practical use. We must go further, and inquire what is *due security* for monies loaned by a trustee? Can the court adopt a general rule, or must each case be left to be decided on its own peculiar circumstances?

A review of the cases in England will lead us to the rule adopted on this subject by the court of chancery there, and will aid us in testing the propriety of its adoption here.

In the case of Sir Ed. Hale and the Lady Car, in chancery, 1637, referred to in 3 *Swans.* 64, in *notis,* the Ld. Keeper says, if a person intrusted with others' monies, let it out to such as are trusted and esteemed by others to be men of worth and ability, if any loss happen, he shall not bear the loss. In *Morley* v. *Morley,* 2 *Ch. Ca.* 2, (1678,) the defendant being trustee for an infant, was robbed of forty pounds sterling, and also of two hundred pounds of his own money: the court held, he was bound only to keep it as his own, and allowed it to him in the account. And in *Jones* v. *Lewis,* 2 *Ves.* 240, (1750,) Ld. Hardwicke held the same doctrine. These cases (the two last especially) seem to go on the principle that a man will always be careful of his own property; and that if he extends the same degree of care to the property of others in his hands as to his own, he will be in no danger. If all men were prudent in the management of their own affairs, there might be safety in adopting this principle; but that is not the case, and hence the later authorities have sought to establish one more uniform and stable.

In *Adye* v. *Feuilleteau,* 1 *Cox,* 24, (1783,) an executor had

loaned money on a bond, and it was lost. He was held personally liable. Ld. Loughborough (sitting as a commissioner in chancery) said, it was quite a settled point that an infant's money could not be laid out on personal security, and that no such investment of trust money would be sanctioned by the court: and Baron Hotham, sitting with him, said, the court always disapproved of it. *Holmes* v. *Dring*, 2 *Cox*, 1, was a case before Ld. Kenyon at the rolls, in 1787. Two executors lent three hundred pounds on a bond with *security*. The obligors were in very ample circumstances at the time the money was lent, but afterwards became insolvent. The court said, that no rule in a court of equity was so well established, as that a trustee cannot lend an infant's money on private security. It should be rung in the ears of every person who acts in the character of trustee. In *Lowson* v. *Copeland*, 2 *B. C. C.* 156, (1787,) Ld. Thurlow held an executor chargeable with an outstanding bond debt, because he had not called it in, though the defendant, in his answer, stated that he supposed it was his own property as a part of the residuum of the estate, and that he had been so advised. In *Orr* v. *Newton*, 2 *Cox*, 274, (1791,) Ld. Camden disapproved this case, and considered it too strict; but it appears to be sustained by subsequent decisions. *Wilks* v. *Steward*, *Coop. Eq. Rep.* 6, (1801,) is a very strong and decided case, and shows the determination of the court to abide by some safe and general principle, rather than trust to the judgment of trustees in every case. Testator directed his executors to lay out a legacy in the funds, or "on such other good security as they could procure and think safe." Sir William Grant, master of the rolls, was clearly of opinion that the executors had no power, even under this direction, to place out the money on personal security. This was followed by a still more rigorous case: *Powell* v. *Evans*, 5 *Ves. jr.* 844, (1801.) Testator died in 1792. Part of his estate was out on real, and part on personal security. Three hundred pounds was loaned by the testator himself to one Price, and Roberts as his surety. The debts were paid, there were no legacies due, and there existed no necessity for calling in the money; and the interest being regularly paid up to 1795, the executor permitted the money to remain where it had been placed by the testator and where he

34

found it.   In April, 1796, Price, the principal, proved bankrupt, and the security was unable to pay.   The master of the rolls held, that where infants are concerned, trustees are not to permit money to remain on personal security ; and they were charged with the loss.   This was followed by the case of *Vigrass* v. *Binfield*, decided by the vice-chancellor in 1818, 3 *Mad.* 40 ; in which it was expressly ruled to be improper for an executor to loan money on a promissory note ; and it was ordered to be paid into court.

In opposition to these very decided authorities, there is but one express decision that I have met with, and that is the old case of *Harden* v. *Parsons*, 1 *Eden*, 145 ; in which Ld. Northington says, that lending trust money on a note is not a breach of trust, without other circumstances *crassæ negligentiæ*.   In support of his opinion he cites the case of *Ryder* v. *Bickerton*, in 1743 ; but when that case is examined, as given in 3 *Swans.* 80, in *notis*, it does not sustain his position.   This decision of Ld. Northington has long been repudiated ; and in the late case of *Walker* v. *Symonds*, 3 *Swans.* 1, (1818,) Ld. Eldon disapproved it in marked terms, and said it was different from the doctrines on which the court was accustomed to proceed.

The principle to be extracted from these authorities is, that the loaning of trust money, and especially where infants are concerned, on private security, is not a compliance with the rule that requires *due security* to be taken, and of course, that such loans are made at the risk of the trustee.   The decisions for the last half century have been uniform on this point, and the law, therefore, may be considered as settled at Wesminster Hall.   And it appears to me that the rule is a safe one, not only as it regards the *cestui que trust*, but the trustee also.   There is a risk to the *cestui que trust*, even when investments are the most carefully and securely made in the stocks or on landed security.   Stocks are liable to great depression.   The abundance or scarcity of the circulating medium in a community, and the prospects of peace or war, to say nothing of the agitations caused by the spirit of restless and unprincipled speculation, are constantly causing a fluctuation in the stocks.   So, in like manner, lands are liable to depreciate from similar causes, though not in so great a degree. Losses occasioned by a fall of stocks are to be borne, it has been

April, 1831.

Gray et al.
v.
Fox et al.

decided, by the *cestui que trust ;* and I presume the same rule would be applied to a loss growing out of a depreciation of real property, where the investments had been originally made with due and proper caution. But the risk is greatly increased when trustees are permitted to loan out money on personal security, and to be free from responsibility in all cases where the borrower was at the time a man in good credit. No person is exempt from misfortune. The man who is to-day solvent, and even in affluence, may by some sudden and desolating visitation, be in poverty tomorrow ; and if not so, he has, in consequence of there being no lien on his property, the power of disposing of it to answer sudden emergencies and pressing calls. And how often does it happen that the integrity of a man fails in the hour of temptation, and he is induced to make dispositions of his property which neither honour nor conscience can justify.

The rule is also a safe one for the trustee. It cannot be misunderstood ; and being uniform and general, renders the path of his duty plain. It would ofttimes relieve him from the importunity of those who may wish to be obliged, and who may suppose they have personal claims upon him, but cannot give the proper security.

But though the principle appears to be so firmly settled in England, I do not find that it has been adopted to the same extent in this country.

In *Smith* v. *Smith,* 4 *Johns. C.* 281, the question came up incidentally before Chancellor Kent. As the case appeared before him he was not called on to decide it, but he gave his sanction to the doctrine, that a trustee loaning money must require adequate real security or resort to the public funds, so far as to express himself satisfied that it was a wise and excellent general rule.

In 1824, the case of *The Administrators of Richard I. Cooper* v. *The Executors of Isaac Cooper,* was decided in New-York by Chancellor Sanford : *Hop.* 233. It appeared that Isaac Cooper held two notes of one thousand two hundred and fifty dollars each, given by the Union Cotton Manufactory to Richard I. Cooper. He held them in trust for the representatives of Richard, and afterwards invested them in stock of the Otsego Cotton Manufactory, which became insolvent. The defendant alleged

April, 1831.

Gray et al.
v.
Fox et al.

that the investment was made in good faith, and was considered by all to be advantageous at the time. The case came up on the bill and answer, and the court decided the trustee was not chargeable. This case does not appear to have received much attention from the counsel or the court. The executor found the investment in one company; he changed it to another; and it appears by the very short opinion of the chancellor, that this change was considered by all to be advantageous. This may be taken as tantamount to an agreement on the part of those concerned; though it does not appear that the court put itself on that ground, but rather on the principle of good faith in the trustee.

I am not able to ascertain that the English rule has ever been adopted in this court, and I should feel some hesitancy in adopting it to the extent to which it is carried in their courts. The situation of the two countries differs very materially in many respects, and especially as it regards the facility of investments; and what may be a prudent rule of policy in one country, may not be in another. In England, property can always be invested in the funds. These are recognised by their courts as safe and permanent securities, and it is the policy of every branch of the government to consider them so. In this country, the amount of public or government stock is very small, and in an inland state like our own, there are few opportunities for investing in that kind of security. The stock of private companies is not considered safe, and investments in that species of stock would scarcely be encouraged by a court of equity. There is, then, no other but landed security that would come within the rule. This can most generally be attained, and the court would advise it to be taken in all cases where public stock cannot be procured. It is safe to all parties, and is in accordance with the policy of the act directing the mode in which the money of infants in the hands of trustees may be put out to interest.

But while I take this opportunity of commending the safety of the English rule, and of warning trustees how they deal with the property of infants without securing it on real estate or in the funds, I do not feel myself called on, in this case, to adopt it in its rigour. For, admitting that these trustees had right to loan this money on personal security, still, an examination of the

case has led me to the conclusion, that in making this loan, they did not exercise that degree of care and circumspection which will free them from liability in case of loss.

It appears, in the *first place*, that the loan was made to Jonathan Britton on his simple bond, without even any personal security.

At this time Jonathan Britton was a trading man; he was engaged in the lumber business, and was about to engage in mercantile pursuits, of all others, perhaps, the most hazardous, especially to the inexperienced. This should have induced great caution on the part of the trustees. They should have hesitated long, before they committed to his hands, at that time, and under those circumstances, so large a sum of money: and it is to be considered, also, that this loan was not temporary, for sixty or ninety days, but was intended as a permanent investment.

*Secondly*, They neglected to avail themselves of the privilege granted them by law, of putting out this money under the sanction of the orphan's court.

I do not mean to say that when trustees omit to avail themselves of that protection, they are always to be held liable: I am not called on now to affirm or deny that principle. I only mean to say, that the omission to procure such direction, is a species of negligence that must always have its weight. But,

*Thirdly*, The defendants have failed to show that Jonathan Britton was, at the time of the loan, a man of such property and substance as would justify the loan: nay, I think the contrary is plainly to be inferred from the evidence.

The testimony is not as full on this subject as it might have been. One of the witnesses, William Robertson, says, that about the time Britton got the money, "his credit was very fair as to his ability to meet his engagements." It may all be true, that he was reputed to be able to meet his engagements; yet the safe inquiry for the trustees to make, was, what is his property, and what are his means of securing a repayment? We find from the testimony of this witness, that his credit soon began to fail. In 1822, he commenced store-keeping, in the fall. In 1823, he removed to another stand; and in the former part of that year, he did a good deal of business, and was in good credit; but be-

April, 1831.

Gray et al.
v.
Fox et al.

fore the end of the year his credit began to decline, and people became doubtful of him. And when we look at the exhibition made of his concerns by the sheriff of the county, soon after, it is not surprising. It is proved that in 1823, he was prosecuted by the New-Hope Delaware Bridge Company, and that in October of the same year, a judgment in their favour was entered against him for one thousand four hundred and thirty-two dollars and fifteen cents, on which an execution issued and was placed in the hands of the sheriff. In February, 1824, another judgment was entered against him, in favour of Peter I. Nevius, for two hundred and sixty-three dollars and thirty-seven cents. His real estate appears to have been mortgaged for *more than its value*. A suit was brought on the mortgage, and in October, 1824, an execution issued out of this court against the property, for one thousand two hundred and eighteen dollars and ten cents. The mortgaged premises, when sold, brought but eight hundred dollars ; while the amount realised by the sheriff from all the rest of his property, when sold, was less than two hundred dollars.

There is nothing to induce the belief that in the years 1822 and 1823, he parted with any valuable property, nor is his speedy insolvency in any way accounted for.

I think the manifest inference from these facts is, that Jonathan Britton, at the time the loan was made, was not a man of substantial property ; and that a little inquiry would have satisfied the trustees of the real state of his affairs. These inquiries were not made : they trusted simply to the credit of the person with whom they were dealing, and in so doing, acted with a degree of carelessness and negligence which this court cannot overlook.

It does appear to me, that under these circumstances, the trustees can have no reason to complain, if they are held responsible for the loss.

The administrators, then, are to be charged, unless they are protected by the proceedings of the orphan's court ; and this brings me to the remaining question in the cause.

The answer states, that after the loan to Jonathan Britton, Edmund Smith, who is guardian for a number of the infant heirs of Arthur Gray, was dissatisfied, and employed counsel to make application to the orphan's court to have the money better

secured : that Britton, one of the administrators, hearing of the proposed application, attended the court in October, 1822, and, being called on to have the said money secured by such sufficient security as the court should approve, offered to give a mortgage to his co-administrator to secure the payment of Jonathan Britton's bond : that the application was postponed to a special term of the court in December, at which time Britton again attended, and prayed the direction of the court in the premises. The court thereupon made the following order, substantially, stating it to be " on the application of the administrators of Arthur Gray." It appearing to the court that the trust money had been loaned by the administrators to Jonathan Britton, on his bond ; and the said John Britton (the administrator) now offering to give a mortgage to his co-administrator, on certain property, to secure the payment of the said money, and praying the approbation of the court thereupon ; the court, on consideration, approve the said security, and order that the said money remain on interest on the security of the said bond and mortgage, until otherwise disposed of, agreeably to the act of the legislature. This order of the orphan's court, is set up by the defendant as a bar to all claims of the plaintiffs.

The orphan's courts are authorized to require executors and trustees to give security to persons interested, and also to one another, in certain cases specified in the act, and they are also authorized to give leave and direction to them to put out their minors' money to interest, upon security such as they shall allow of: *Rev. Laws*, 778–9. From the history of this proceeding in the orphan's court, given by the complainant, and from the decree entered by the court itself, I have been at a loss to ascertain what was the actual intention of the court. The proceeding appears to have originated with some of the heirs, who had fears for the safety of the money, and it is evident that it was originally an adversary proceeding. The defendant says, that Britton attended at the court in October, and *being called on to have* the said monies secured by such security as the court should approve, he offered to give a mortgage to the defendant : on the other hand, the decree purports, on the face of it, to be on application of the administrators of Arthur Gray. If made on such application, it

must have been under the eleventh section of the act : *Rev. L.* 779. This section provides, " that executors, administrators, trustees or guardians, may, by leave and direction of the orphan's court, put out their minors' money to interest, upon such security and for such a length of time, as the said court shall allow of," &c. It is insisted on by the defendant, that the court acted under this section, and that their order is final and conclusive. The decree of the orphan's court on a matter over which it has jurisdiction, if fairly obtained, is certainly not to be questioned in a collateral way even in this court. But that court is one of limited power and jurisdiction. If it transcend its jurisdiction, its acts will pass for nothing ; and if an order is obtained by fraud or misrepresentation, it may be set aside or considered null. Now, under the eleventh section, the orphan's court may give leave and direction to trustees, &c. to put out their minors' money. It does not appear that in this case any leave was obtained, or any direction asked of the court to put out this money. On the contrary, it appears that the investment was made some months before, and without any directions for that purpose either obtained or asked. The administrators assumed the responsibility themselves. This they had a right to do if they chose : I do not say it was proper for them to do so. In cases coming under the act, trustees may take the responsibility of loss upon themselves, or they may throw it on the court. If the latter course is pursued, the directions of the statute are plain. They must obtain leave and direction for the purpose of putting out the money ; not put out the money first, and at some future day, when difficulties are foreseen or loss apprehended, go to the court and obtain a decree of confirmation. No such power is given to that court ; nor have the administrators or trustees any authority, under the statute, to make such application. This may appear to be a rigid and harsh construction of the act, and I confess it appears so at first sight ; but I think a moment's reflection will satisfy us of the propriety, if not necessity, of construing the power of the orphan's court in this respect strictly. It was doubtless the intention of the legislature that the trustee, in putting out minors' money, should be implicitly governed by the direction of the court. In all such cases, the court derives its information mostly from the representations of the

trustees themselves, who can or ought to have no possible tempta- <span>April, 1831.</span>
tion to impose upon the court. One common motive should go-
vern all—that the minors' money should be safely invested. But
so construe this statute as that trustees may invest money at their
own risk, and at any time afterwards come before the court to
seek a confirmation which shall shelter them from all danger,
and be conclusive upon the rights of those who are not able to be
heard, and who are reposing in the security afforded by the
wholesome provisions of the law, and we place them before the
court in a very suspicious attitude. Their object for coming there
will be their own safety alone, and not that of the fund. You
place them under strong temptations, such as many men are not
able to resist; and any one who is conversant with the ordinary
mode of doing business in that court, must be satisfied that the
greatest imposition would often be practiced, and the grossest
frauds committed. I feel satisfied, therefore, to say that this or-
der is not made in pursuance of any authority vested in the court,
and not within its jurisdiction, and therefore is no protection to
the administrators.

Gray et al.
v.
Fox et al.

It is true that in this case the court did more than merely con-
firm the loan—they approved of the security that was offered.
This does not alter the principle. Would the court, if the money
had been in the hands of the administrators, have directed a loan
to Jonathan Britton at that time, on such security? I think not:
but the money was already loaned, and the court appeared wil-
ling to do something to save it.

As between the two administrators, Britton and Fox, I see no
ground for any distinction. They both *concurred in the loan*,
and the liability is joint.

Let an account be taken of the principal and interest due the
complainants. The question of costs, and all further equity and
directions, are reserved until the coming in of the master's re-
port.